NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13873


COMMONWEALTH  vs.  BYRON PALMER.



Suffolk.     April 6, 2026. - August 10, 2026.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, Georges,
Dewar, & Wolohojian, JJ.


Controlled Substances.  Constitutional Law, Search and seizure,
    Reasonable suspicion.  Search and Seizure, Threshold police
    inquiry, Reasonable suspicion, Pursuit.  Threshold Police
    Inquiry.  Practice, Criminal, Motion to suppress.




Indictment found and returned in the Superior Court
Department on November 23, 2021.

A pretrial motion to suppress evidence was heard by Michael
P. Doolin, J., a motion for reconsideration was considered by
him, and the case was tried before James F. Lang, J.

After review by the Appeals Court, 106 Mass. App. Ct. 47
(2025), the Supreme Judicial Court granted leave to obtain
further appellate review.


Craig E. Collins for the defendant.
Ian MacLean, Assistant District Attorney, for the
Commonwealth.
Rebecca Kiley, Committee for Public Counsel Services,
Katharine Naples-Mitchell, Claudia Leis-Bolgen, & Radha
Natarajan, for Committee for Public Counsel Services & others,
amici curiae, submitted a brief.

GAZIANO, J.  In January 2021, police officers approached the defendant, Byron Palmer, outside an apartment complex in the Jamaica Plain section of Boston to question him regarding a robbery and shooting.  The officers called out to the defendant to get his attention.  In response, the defendant ran across a parking lot, and the officers gave chase.  During the brief pursuit, the defendant discarded money and drugs.  He was subsequently arrested and indicted for, among other charges, possession with intent to distribute a class B controlled substance (cocaine).

The defendant filed a motion to suppress the discarded evidence, arguing that his seizure was not supported by reasonable suspicion.  A Superior Court judge denied the motion.  Subsequently, a jury found the defendant guilty on the drug charge.  On appeal, the defendant challenges the denial of the motion to suppress.

Resolving the appeal requires us to first determine the moment of seizure and then decide whether the police had reasonable suspicion to conduct a threshold inquiry.  See Commonwealth v. Barros, 435 Mass. 171, 173, 176 (2001).  We first conclude that the defendant was seized when two groups of officers, approaching from different directions, began to pursue the fleeing defendant -- before he discarded the drugs.  We then

conclude that, at that moment, there was reasonable suspicion to believe that the defendant had committed a crime.  Accordingly, the motion to suppress was properly denied.[1]

1.  Background.  a.  Facts.  We recite the facts found by the motion judge, "supplemented by uncontroverted and undisputed facts from the record that have been credited by the motion judge."  Commonwealth v. Privette, 491 Mass. 501, 503-504 (2023).

On January 2, 2021, a cellular telephone salesperson met with a customer in an apartment complex in Jamaica Plain. Inside one of the residential buildings, an individual robbed the salesperson, taking two cell phones before leaving the building.  When the salesperson followed the robber to the rear of the building to attempt to recover the stolen cell phones, the robber pulled out a firearm and fired a single round in the salesperson's direction.  A short time after, the salesperson reported the robbery and shooting to a police officer parked in the vicinity of the apartment complex.  He described the assailant to the officer as a man who stood six feet, one inch tall; was wearing black clothing and a camouflage mask; and

---

[1] We acknowledge the amicus brief submitted in support of the defendant by the Committee for Public Counsel Services, the Criminal Justice Institute at Harvard Law School, the Massachusetts Association of Criminal Defense Lawyers, and the New England Innocence Project.

spoke with a southern accent.  Police were unable to locate any suspects on the day of the robbery but did find a spent shell casing in the area where the shooting had occurred.

Detective Allison Eng of the Boston police department conducted a follow-up investigation.[2]  She responded to the scene of the crime and interviewed the victim.  She then recovered the spent shell casing from the rear of the building.  Next, Eng contacted Shannon O'Donnell -- a Boston Housing Authority officer whose job included monitoring video footage from cameras throughout the apartment complex -- and retrieved surveillance footage from her.  The footage was from multiple cameras at different angles inside and outside of the building where the robbery and shooting had occurred.

Eng viewed the footage, which corroborated the victim's account of the crime, "multiple times."  She observed the victim and the customer, who was carrying what appeared to be a brown "Louis Vuitton" shoulder bag, enter a building in the complex. About three minutes later on the footage, Eng watched "[t]he person [she] believe[d] to be the suspect" based on the description of the robber run out of the building "carrying what look[ed] to be the large purse that the [customer] was

---

[2] While Eng was a sergeant at the time she testified at the hearing, we refer to her by her role at the time of the investigation.

originally carrying entering the building." Although the suspect was wearing a face mask in the footage, Eng derived a "[p]retty good clothing description, and a general suspect description." The suspect was wearing a "pretty distinct coat," which Eng described as a "heavy" jacket with "black . . . on the bottom, [and] kind of two-toned gray on the top," and bearing "small writing on one of the arms." He was also wearing "pretty distinct sneakers" that had a "reflective kind of tape going around them." Eng noted that the suspect was also wearing a "black and white checker hat with a large round logo on the front and a metallic tag . . . on the brim of the hat that comes when you purchase the hat." As for the suspect's physical description, Eng described him as "dark skin complected" with a "long dreadlock haircut."

Within a matter of days after the robbery, O'Donnell reached out to another detective because, while reviewing additional video footage from the apartment complex on January 3 (the day after the robbery), she saw someone who "fit the description of the suspect from the incident." That detective sent a text message to Eng with a still image from the footage, stating, "[T]his is [the] guy who did [the] robbery[;] [he] has [a] jacket and sneakers on [the] next day."[3] In addition to

_____

[3] Eng's testimony was inconsistent on several points regarding the evidence from this video footage, including when

viewing the still image, Eng watched the video footage from which the still image was captured and identified "a person fitting the same description of the suspect" in the same hallway where surveillance footage had captured the robber. This time, however, the individual was not wearing a face mask. Eng concluded that the individual was the same person she saw in the video footage from the day of the robbery because "[h]e fit the genera[l] size, complexion and hairstyle of the suspect," and believed he was wearing the same distinctive jacket and sneakers as those of the suspect on the day of the robbery.

On the morning of January 14, 2021, O'Donnell informed another detective that she was watching surveillance footage from the apartment complex "in real time" and observed whom she believed to be the same individual who committed the robbery twelve days earlier. O'Donnell sent Eng a text message stating, "Your guy is back," along with a still image of the individual from the January 14 video footage. O'Donnell and Eng then spoke directly over the telephone.

---

she received the text message containing the still image. The motion judge credited Eng's testimony that surveillance footage from which the still image was captured was from January 3 -- the day after the robbery -- and that she viewed the video footage sometime before the January 14 arrest. The motion judge was permitted to credit or discredit portions of the testimony in his resolution of the conflicting testimony. See Commonwealth v. Guardado, 491 Mass. 666, 676, S.C., 493 Mass. 1 (2023), cert. denied, 144 S. Ct. 2683 (2024).

Following her communications with O'Donnell, Eng decided to go to the location where the individual had been spotted by O'Donnell earlier that day -- a parking lot outside of the same residential building where the robbery had occurred -- to "attempt to identify that individual."  Eng responded to the location "[b]ased on the conversation [she] had with . . . O'Donnell," given that it was "the same location" as the robbery, and because Eng could "clearly see" the hat and the hairstyle of the suspect in the still image.  Eng was accompanied by two other detectives dressed in plain clothes with visible police badges.  Given that "the incident originally involv[ed] a firearm," four uniformed officers also responded to the scene in a police wagon, which they parked in the parking lot.

Eng and the detectives approached the defendant from one direction.  The four uniformed officers, who were about ten to twenty feet away, approached from another direction.  When Eng saw the defendant in the parking lot, she "believed that to be the person responsible for the robbery."  She based that belief on "the hairstyle, the complexion, the hat," and "the size of the suspect."  One of the detectives "called for [the defendant's] attention," attempting to "get his name and information."  The defendant immediately started to run.  Upon seeing the defendant flee, several officers began chasing him.

As he ran, the defendant discarded "individually wrapped" "plastic bags" from his pockets, and one officer saw "individual monetary bills that were swirling in the air."  The pursuit lasted three to four seconds before the defendant stopped, put his hands up, and was detained by police.  The police recovered the discarded items, which were identified as money and drugs.  The defendant was subsequently arrested.

b.  Procedural history.  On November 23, 2021, a Suffolk County grand jury indicted the defendant for, among other charges, armed robbery, in violation of G. L. c. 265, § 17; and possession with intent to distribute a class B controlled substance (cocaine), in violation of G. L. c. 94C, § 32A (c).  On May 3, 2022, the defendant moved to suppress evidence recovered by the Boston police department in connection with his arrest, including all drugs found when the defendant fled.  An evidentiary hearing, which spanned three days, was held on the motion.  On November 10, 2022, the motion judge issued a decision and order denying it.  The defendant subsequently filed a motion to reconsider, which was also denied.

The matter proceeded to trial on March 27, 2023.  The Commonwealth filed a nolle prosequi as to the armed robbery charge, and a jury found the defendant guilty of possession with intent to distribute a class B controlled substance and not guilty on all remaining charges.

The defendant timely filed a notice of appeal on April 7, 2023.  In a full court review, a divided Appeals Court concluded that the defendant's seizure was justified by reasonable suspicion and therefore affirmed the defendant's conviction. See Commonwealth v. Palmer, 106 Mass. App. Ct. 47, 48-49, 58 (2025).  The defendant filed an application for further appellate review, which this court granted.

2.  Discussion.  Under art. 14 of the Massachusetts Declaration of Rights, "[e]very subject has a right to be secure from all unreasonable searches, and seizures, of his person, his houses, his papers, and all his possessions."  An investigatory stop, as a seizure by police, is justified under art. 14 if the police have reasonable suspicion to believe that "the person has committed, is committing, or is about to commit a crime" (citation omitted).  Commonwealth v. Robinson-Van Rader, 492 Mass. 1, 8 (2023).  The police must specifically have reasonable suspicion "at the time of the stop."  Commonwealth v. Matta, 483 Mass. 357, 360 (2019).  Accordingly, "determining the precise moment of seizure [is] critical to the issue of suppression." Barros, 435 Mass. at 173.

Here, the motion judge concluded that the defendant was not seized until he was apprehended following his flight. Additionally, the motion judge determined that, at that point, the combination of evidence "identifying the defendant with

distinctive details and demonstrating his criminality" established reasonable suspicion. He went on to note that the "police were warranted in obtaining the money and drugs discarded by the defendant" because "these items were abandoned and therefore their subsequent recovery by the police did not constitute a search."

"When reviewing a ruling on a motion to suppress, we accept the judge's subsidiary findings of fact absent clear error but conduct an independent review of his ultimate findings and conclusions of law" (citation omitted). Commonwealth v. Yusuf, 488 Mass. 379, 385 (2021). Further, we conduct a de novo review as to both "any findings based entirely on a video recording" and "the application of constitutional principles to the facts as found" (quotation and citation omitted). Id. However, "[w]e leave to the judge the responsibility of determining the weight and credibility to be given oral testimony presented at the motion hearing" (quotation and citation omitted). Id.

a. Time of seizure. Whether police stopped the defendant before or after he discarded the drugs is critical to the outcome of the case. See Barros, 435 Mass. at 173. If police stopped the defendant before he discarded the drugs, the drugs may have been the fruit of that seizure and therefore subject to suppression in the absence of reasonable suspicion for the stop. See Commonwealth v. Rodriguez, 456 Mass. 578, 587 (2010).

However, if the defendant was stopped after he discarded the drugs, "then the drugs could not be the fruit of the seizure, and therefore would not be subject to suppression regardless of the constitutionality of the subsequent stop," given that he abandoned the drugs.  Id.  See Commonwealth v. Stoute, 422 Mass. 782, 785 (1996).

Not all encounters between police officers and members of the public amount to "an intrusion of constitutional dimensions requiring justification."  Stoute, 422 Mass. at 789.  "Police officers are free to make noncoercive inquiries of anyone they wish."  Matta, 483 Mass. at 363.  See Commonwealth v. Narcisse, 457 Mass. 1, 5 (2010) ("police officers may approach individuals on the street to ask them about their business without implicating the balance between State power and individual freedom"); Commonwealth v. Murdough, 428 Mass. 760, 763 (1999) ("officers may make inquiry of anyone they wish and knock on any door, so long as they do not implicitly or explicitly assert that the person inquired of is not free to ignore their inquiries").

Whether a police encounter constitutes a constitutional seizure "depends upon the facts of the particular case."  Matta, 483 Mass. at 363.  See Commonwealth v. Sykes, 449 Mass. 308, 311 (2007), citing Commonwealth v. Thinh Van Cao, 419 Mass. 383, 387, cert. denied, 515 U.S. 1146 (1995) (nature of encounter

between citizen and law enforcement official "is necessarily fact specific and requires careful examination of the attending circumstances").  An individual is "seized" in the constitutional sense when, in view of the totality of the circumstances, "a member of law enforcement has engaged in some show of authority that a reasonable person would consider coercive[,] that is, behavior which could be expected to command compliance, beyond simply identifying [him- or herself] as police" (quotations and citation omitted).  Matta, supra at 362, quoting Commonwealth v. Sanchez, 403 Mass. 640, 644 (1988).  Thus, rather than focusing on whether a reasonable person would believe he or she was free to leave, "the more pertinent question is whether an officer has, through words or conduct, objectively communicated that the officer would use his or her police power to coerce that person to stay."  Matta, supra.  "[T]he coercion must be objectively communicated through the officer's words and actions for there to be a seizure."  Id. at 364.  See Commonwealth v. Daveiga, 489 Mass. 342, 347 (2022) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred" [citation omitted]).

In this case, the facts raise the issue whether the defendant was seized when three (or as many as seven) officers

first approached him in the parking lot, before the defendant fled.[4] While we have never said that the mere presence of a certain number of officers is sufficiently coercive to constitute a seizure, the United States Supreme Court has indicated that "the threatening presence of several officers" is an "[e]xample[] of [a] circumstance[] that might indicate a seizure." United States v. Mendenhall, 446 U.S. 544, 554 (1980). See Commonwealth v. Grinkley, 44 Mass. App. Ct. 62, 74 (1997); Commonwealth v. Pimentel, 27 Mass. App. Ct. 557, 561 (1989). We agree with a majority of the Appeals Court that it is unnecessary to decide whether the defendant was seized when officers initially approached him because "the defendant did not discard the drugs until after he began to run and was immediately pursued." Palmer, 106 Mass. App. Ct. at 54. Thus, the drugs could have been the fruit of the seizure whether the precise moment of seizure was the initial approach or when the officers began to chase after the defendant. We also agree with the majority view of the Appeals Court that "[i]t became apparent the moment the defendant turned to flee and several

---

[4] The motion judge made no findings, and it is unclear from the record, where the four uniformed officers were positioned in relation to the defendant and whether the defendant was able to see the uniformed officers at that time. See Matta, 483 Mass. at 363-364 (no seizure unless officer's conduct objectively communicates coercion). However, once the defendant proceeded to flee, the record is clear that the uniformed officers gave chase.

officers immediately chased after him that he would be compelled to stay." Id.

"Pursuit that appears designed to effect a stop is no less intrusive than a stop itself" (citation omitted). Barros, 435 Mass. at 175. At the same time, a defendant's claim of police pursuit "is not a talismanic formula for converting all police investigation into a stop and seizure" (citation omitted). Sykes, 449 Mass. at 312-313. Instead, pursuit, when objectively considered, is the functional equivalent of a seizure where "the person being pursued is plainly the object of an official assertion of authority, which does not intend to be denied, and which infringes considerably on the person's freedom of action." Stoute, 422 Mass. at 789. See Commonwealth v. Watson, 430 Mass. 725, 731 (2000) (pursuit becomes seizure "when action by the police would communicate[] to the reasonable person an attempt to capture or otherwise intrude on [an individual's] freedom of movement" [quotation and citation omitted]).

Here, after the defendant fled in response to one of the detectives calling for his attention, several police officers, who were all either in uniform or wearing police badges, began chasing the defendant. As can be seen in the body-worn camera footage from one of the uniformed officers, the officers converged on the defendant from more than one direction. This was a show of authority that a reasonable person would consider

coercive, such that the defendant was seized at that moment. See Matta, 483 Mass. at 362; Stoute, 422 Mass. at 789.

The Commonwealth argues that this case is akin to Commonwealth v. Franklin, 456 Mass. 818 (2010). In Franklin, we held that there was no constitutional seizure when police chased a defendant on foot after they had pulled up next to the defendant in an unmarked police car, without its lights on, and the defendant began running away before they got out of the vehicle. Id. at 819, 823. Because there was no evidence that the police exercised any show of authority during that time, such as "command[ing] the defendant to stop" or "block[ing] or imped[ing] his path," the defendant was seized only when officers physically grabbed him at the end of the chase. Id. at 823. See Commonwealth v. Powell, 459 Mass. 572, 575-576, 578 (2011), cert. denied, 565 U.S. 1262 (2012), abrogated on other grounds as recognized by Commonwealth v. Crowder, 495 Mass. 552, 557 (2025) (no seizure when officer followed defendant on foot, after defendant had fled from unmarked police car without its lights activated). See also Franklin, supra at 822 ("following a person, presumably at a rate of speed sufficient to keep him in sight, does not amount to a seizure absent some additional assertion of authority, by direct verbal communication ['stop'] or otherwise [blocking, use of flashers]").

This case is unlike the situation in Franklin for two reasons. First, in that case, "the defendant's flight was not prompted by anything the police did and, indeed, began before the officers got out of their [unmarked police car]." Franklin, 456 Mass. at 822-823. Here, the defendant fled from officers after they approached him on foot and called out to him. The officers' pursuit of the defendant after he did not respond to the initial request to talk and started to run is "highly relevant" to our inquiry. Barros, 435 Mass. at 175-176. Second, and more importantly, two groups of officers -- detectives with police badges displayed and a contingent of uniformed officers (called to the scene for added security) -- converged on the defendant from different directions within the confines of a crowded residential parking lot. There can be little doubt that, given these circumstances, the defendant was plainly the object of an official assertion of authority. See Stoute, 422 Mass. at 789.

As such, the defendant was seized when, after running from police, he was pursued by the officers -- before he discarded the drugs.

b. Reasonable suspicion. We turn next to whether, at the time of seizure, the officers "had reasonable suspicion to believe that the defendant was committing, had committed, or was about to commit a crime" (quotation and citation omitted).

Matta, 483 Mass. at 365.  "Reasonable suspicion must be based on specific and articulable facts, and reasonable inferences therefrom, in light of the officer's experience" (quotation and citation omitted).  Privette, 491 Mass. at 507.  It "requires less than probable cause to arrest but . . . more than just a hunch."  Commonwealth v. Henley, 488 Mass. 95, 102 (2021).  "The calculus of reasonable suspicion examines the totality of facts on which the seizure is based" (quotation and citation omitted).  Robinson-Van Rader, 492 Mass. at 8.  The Commonwealth bears the burden of showing that a seizure is supported by reasonable suspicion.  Commonwealth v. Comita, 441 Mass. 86, 91 (2004).

Before proceeding with our reasonable suspicion analysis, we make two preliminary notes.  First, because the seizure began before the defendant discarded the drugs, the drugs play no role in our analysis, and we do not examine whether there was reasonable suspicion to believe the defendant was committing any drug-related crime.  See Commonwealth v. Anderson, 461 Mass. 616, 623, cert. denied, 568 U.S. 946 (2012) ("information learned during an investigative stop cannot provide reasonable suspicion for the stop").  Rather, "the totality of the facts on which the seizure is based must establish an individualized suspicion that the person seized by the police is the perpetrator of the crime under investigation" (quotation and

citation omitted), <u>Commonwealth</u> v. <u>Meneus</u>, 476 Mass. 231, 235 (2017) -- in this case, the robbery.

Second, we look only to the information known to Eng, and not O'Donnell, at the time of the seizure to determine whether there was reasonable suspicion. The Commonwealth did not present any evidence that O'Donnell had additional knowledge that would have added to the calculus of reasonable suspicion beyond what Eng had.[5] See <u>Commonwealth</u> v. <u>Johnson</u>, 481 Mass. 710, 726 n.14, cert. denied, 589 U.S. 977 (2019) ("we must judge the motion to suppress solely on the record made at the suppression hearing" [citation omitted]).

Turning to our reasonable suspicion analysis, Eng received the following information before the seizure: (1) the victim of the robbery described the robber as a six feet, one inch tall man with black clothing and a camouflage mask; (2) video footage

---

[5] Because all the relevant evidence presented by the Commonwealth had been independently viewed by Eng, we need not apply the collective knowledge doctrine to add O'Donnell's knowledge to the reasonable suspicion inquiry. See <u>Privette</u>, 491 Mass. at 513. See also <u>id</u>. at 508 (collective knowledge doctrine permits aggregation of information known to multiple officers). Specifically, Eng had reviewed (1) the January 2 video footage; (2) the January 3 still image and video footage; and (3) a still image from the January 14 video footage. While Eng did not review the surveillance footage that O'Donnell watched "in real time" on January 14, nothing was introduced by the Commonwealth from that footage apart from the still image. Moreover, Eng was able to make a contemporaneous observation of the suspect on that date when she went to the parking lot after receiving the still image of the suspect taken from the video footage by O'Donnell.

from the same time frame and area of the robbery showed a suspect with a dark complexion and a "long dreadlock haircut" wearing a mask, a black and white checker hat with a large round logo on the front and a metallic tag on the brim, a black and gray jacket with small writing on one of the arms, and sneakers with reflective tape going around them; (3) a still image and video footage from the day following the robbery captured an unmasked man who appeared to have the same size, hairstyle, complexion, and distinct jacket and sneakers as the suspect; and (4) a still image captured twelve days after the robbery showed an individual with a similar hat and hairstyle in the area where the robbery had occurred.

Additionally, when Eng returned to the crime scene twelve days later to find the suspect, she observed a person -- the defendant -- whom she believed to be the one "responsible for the robbery." She based her belief "on the size of the suspect," his "hairstyle," his "complexion," and the fact that "he was wearing [the same] hat that he was wearing" on the day of the robbery, which had a black and white checkered pattern with a large round logo on the front and a metallic tag on the brim.

The defendant argues that the officers stopped him based on a vague suspect description that could have fit any number of individuals in the area. We are mindful of our obligation to

proceed with caution in these circumstances.  "The fact that an individual matches a broad, general description does not alone amount to reasonable suspicion, particularly if that description could fit many people in the area where the stop takes place." Robinson-Van Rader, 492 Mass. at 9.  See, e.g., Meneus, 476 Mass. at 236 (victim did not provide police with "usual descriptive information such as distinctive clothing, facial features, hairstyles, skin tone, height, weight, or other physical characteristics that would have permitted them to reasonably and rationally narrow the universe of possible suspects"); Commonwealth v. Warren, 475 Mass. 530, 535-536 (2016) (victim described suspects as "two [B]lack males wearing the ubiquitous and nondescriptive 'dark clothing,' and one [B]lack male wearing a 'red hoodie,'" with no additional physical characteristics, such as "hairstyles, skin tone, height, [or] weight"); Commonwealth v. Cheek, 413 Mass. 492, 496 (1992) (suspect described over police radio as "[B]lack male with a [B]lack [three-quarter] length goose [jacket]," with "no additional physical description . . . that would have distinguished the defendant from any other [B]lack male in the area such as the suspect's height and weight, whether he had facial hair, [or] unique markings on his face or clothes").

However, this is not a case where the police seized an individual based solely on a generalized description of a

suspect provided by a witness to a crime.  Here, Eng watched surveillance footage from the day of the robbery to develop her own description of the suspect.  She then reviewed video footage and a still image from the day after the robbery to observe "the same suspect," as the motion judge found, in the same location -- this time without a mask.  Cf. Commonwealth v. Boswell, 374 Mass. 263, 267 (1978) ("when the officers had reliably ascertained that the surveillance photographs provided a good representation of the robbers, they had probable cause to arrest the persons shown in the photographs").  On the day of the arrest, Eng recognized the defendant as the same individual who committed the robbery twelve days earlier, relying on the suspect's size, complexion, and hairstyle, and the unique features of his hat.

Standing alone, each of these factors might not be sufficient to establish reasonable suspicion.  See Privette, 491 Mass. at 520 ("hats . . . are easily worn, taken off, changed, or discarded"); Commonwealth v. Davis, 487 Mass. 448, 469 (2021), S.C., 491 Mass. 1011 (2023) ("All one can see is that the shooter is a Black man with long hair in braids or dreadlocks that extend down to his midback.  As amici point out, braided hairstyles are not uncommon among Black people" [footnote omitted]); Commonwealth v. Mock, 54 Mass. App. Ct. 276, 279, 282-283 (2002) (no reasonable suspicion to stop

defendant where motion judge found that defendant fit only general description of suspect as Black male). However, our reasonable suspicion analysis examines the totality of facts, see Robinson-Van Rader, 492 Mass. at 8, and "a combination of factors that are each innocent of themselves may, when taken together, amount to the requisite reasonable belief that a person has, is, or will commit a crime" (quotation and citation omitted), Warren, 475 Mass. at 535.

In addition to the description of the suspect's physical characteristics and his hat, we also note two factual circumstances that add to the calculus of reasonable suspicion. Although these factors are accorded minimal weight in our analysis for the reasons discussed below, they are each properly considered in the totality of the facts.

First, while flight alone is insufficient to establish reasonable suspicion, it is a "factor properly considered in the reasonable suspicion analysis." Warren, 475 Mass. at 538. See, e.g., Commonwealth v. Karen K., 491 Mass. 165, 180 (2023) (juvenile's efforts to evade police contributed to calculus of reasonable suspicion).[6] Second, the motion judge found that the

---

[6] We note that if the defendant was seized when officers initially approached him -- before he ran -- flight would not be properly considered as a factor in our analysis of reasonable suspicion. Nevertheless, the absence of flight would not alter our conclusion that there was reasonable suspicion to believe that the defendant committed the robbery.

robbery and arrest occurred in a "high crime area." While, like flight, we have cautioned against relying on the characterization of a particular neighborhood as a "high crime area," see, e.g., Meneus, 476 Mass. at 238, we have also acknowledged that it can be a factor in the determination of reasonable suspicion when there is a "direct connection with the specific location and activity being investigated" (citation omitted), Commonwealth v. Evelyn, 485 Mass. 691, 709 (2020). See Commonwealth v. Sweeting-Bailey, 488 Mass. 741, 752-753 (2021), cert. denied, 143 S. Ct. 135 (2022). See also Commonwealth v. Gomes, 453 Mass. 506, 512 (2009) (high crime area "must be considered with some caution because many honest, law-abiding citizens live and work in high-crime areas" [citation omitted]). Here, there is a direct connection between the investigation into the robbery and shooting and Eng's testimony that there was a "history" of "police reports with robberies, shootings, . . . [and] calls for violent crimes" in the apartment complex, and the crime being investigated indeed took place in the same complex.

3. Conclusion. At the time the defendant was seized -- that is, when the officers began to chase after him -- Eng had reasonable suspicion to believe that the defendant had previously committed a robbery. As such, the seizure of the defendant was reasonable, and the drugs he subsequently

discarded are not the fruit of an unlawful seizure.

Accordingly, the motion to suppress was properly denied.

<u>Judgment affirmed</u>.